### THE PATIENCE.

### THE PANTHER.

### M. & J. TRACY, Inc., v. READING CO.
### No. 14995.

District Court, E. D. New York.

Sept. 1, 1937.

Barber, Matters, Gay & Vander Clute, of New York City (Carl F. Vander Clute, of New York City, of counsel), for libelant.

Macklin, Brown, Lenahan & Speer, of New York City (Richard Lenahan and Leo F. Hanan, both of New York City, of counsel), for claimant-respondent.

ABRUZZO, District Judge.

The libelant, owner of the barges Junior McCann and No. 211 and barge Green Island, sues the tug Patience and the tug Panther. On April 7, 1936, these two tugs left Port Reading, New Jersey, at about 6:20 p. m., bound for New York, with sixteen loaded coal barges made up in five tiers of three barges each with the sixteenth barge hanging on the port side. The barge Junior McCann was the fourth barge on the port side, and the No. 211, the sixteenth boat, was the sixth barge on that side. The Green Island was the end barge of the middle tier. The tug Patience was on the hawsers of the tow, and the tug Panther was on the starboard side acting as the helper tug. From Port Reading the tow proceeded up the Kills to New York Bay. While proceeding up New York Bay, the barges Junior McCann and No. 211 took so much water into their cargoes that they sank. The Green Island and several other boats were shifted around to the lee side of the tow, namely, the starboard side. Later, the tug Patience parted her hawser, causing the tow to drift back onto a buoy which damaged the barge Green Island.

There seems to be no dispute that on the 7th day of April, 1936, the weather was unsettled. Port Reading is a sheltered area and the Kills are known as sheltered waters.

The libelant claims that the storm which caused these barges to take on so much water came on gradually and the captains of the tugs could have or should have known and foreseen the danger of this storm and remained in the lee of the Kills in order to protect their tow. There seemed to be no means of communication between the tug Patience and the tug Panther. There is also much conflict-

530

ing testimony as to the nature and extent of the storm, and particularly as to the time when it reached its height.

The libelant's witnesses indicated that before the storm reached its height, spray was flying over these barges and the elements and clouds were of such a nature that the captains of the tugs, having had great experience with weather conditions, were put on notice of trouble in New York Bay. Furthermore, it appeared that Captain Eilich of the barge Highland Lake notified the tug Panther that the barges were in danger, and they must have been because they subsequently sank.

The claimant-respondent contends through its witnesses that the storm came up suddenly without any warning and that the captains of the tugs were not put on notice of any dangerous storm and rightfully proceeded with their tow into New York Bay. It is needless to refer in detail to the testimony of the various witnesses regarding this phase of the case.

There seems to be some dispute between the witnesses as to whether the captains of these tugs had lost the tide and were making their way into New York Bay in order to gain the benefits of a favorable tide. However, the lack of means of communication between the respective captains and whether they had lost a favorable tide do not seem to be the crux of this action. The case was ably and thoroughly tried by both sides, and many decisions are quoted in the briefs of both proctors; but it seems to the court that the case turns upon one element only, and that is, when did the storm which caused the sinking of the barges come up, and did the captains have fair warning of it? If they left the Kills at a time when they knew or should have known that when they arrived in New York Bay a severe storm would break, unquestionably the captains of the tugs should be held responsible. The tow was very heavy and the barges were laden so that there was very little free board. The captains of the tugs would have to take into consideration all of the facts and circumstances of the situation, including the important factor that these barges were laden so as to leave so little free board.

The differences arising between the witnesses for the libelant and those for the claimant-respondent are understandable. No records were kept which could be referred to by any of the witnesses, and they had to rely on their memories in giving their testimony which was perhaps subconsciously influenced by their interests of friendship or employment. However, complete reliance can be placed upon the unprejudiced witness, Benjamin Parry, who held the position of meteorologist with the Department of Agriculture. He brought to court the records of the Weather Bureau for April 7, 1936. It is undisputed that the barges sank some time between 11:00 p. m. and 12:00 p. m. on April 7, 1936, somewhere in New York Bay; but the exact moment or place was not definitely established by the evidence. The failure to make definite the time or the place is of no particular consequence in view of the records of the Weather Bureau. The records of the weather were taken on the roof of 17 Battery Place, New York City, and the testimony of Benjamin Parry, respecting the weather at the time the barges sank, was as follows:

Page 153:

"Q. Now, will you turn to your records of April 7, 1936, and will you give us the force and velocity of the wind at six o'clock p. m.? A. Northwest 15."

Page 154:

"Q. And between six and seven? A. West 21.

"Q. Now, go right along now. A. Between seven and eight, west 21. Between eight and nine, west 18. Between nine and ten, west 17. Between 10 and 11, west 24. Between 11 and 12, west 43.

"Q. Now, between the hours of ten and eleven, did the wind change? A. Yes, it changed to northwest and it blew at a velocity of 33 miles at 10:55.

"Q. At 10:55, a velocity of 33 miles? A. Yes."

Page 155:

"Q. Now, what do you say as to the suddenness of this storm? A. The wind had been blowing on the 7th generally from the north, the northeast and the east up to around about three o'clock, and then it shifted into the northwest, and continued about four hours and then it blew west up until midnight with the exception of short periods when it swung to the northwest again. I should not say that is a sudden shift, it came around gradually from the northeast to the west.

"Q. I mean about the suddenness of the velocity of the wind. A. The velocity in-

creased rather rapidly between ten and eleven, jumping up from 17, an average velocity at ten o'clock to an extreme of 33 at 10:55.

"Q. Now, ordinarily when you expect a storm that reaches 40 miles, why, you try to anticipate them, don't you? A. Yes.

"Q. And did your record give you any forewarning of this storm? A. We did not have any storm warnings. Not so far as I could see, we did not anticipate the winds of gale force."

Under these circumstances the captains of the tugs were unable to foresee the suddenness of this storm and were justified in leaving the Kills with their tow. To hold otherwise would be placing an onerous duty on the captains of tugs that would be unjustified under the set of circumstances in this case. It would in fact compel them to foresee what the Weather Bureau, with its trained men and sensitive weather recording implements, were unable to foresee in time to give warnings. The court therefore finds in favor of the respondents with respect to the damages done to the barges Junior McCann and No. 211.

The tug Patience was at fault with respect to the damage to the Green Island caused by contact with the buoy. The parting of the hawser and the fouling of the buoy was an independent act of negligence as indicated by the testimony of Captain Bill of the tug Patience on page 77:

"Q. What happened to your hawser? A. As I was crossing over, my hawser got one of the buoys—the strong ebb tide had the buoy tailed down flat, and I figured that as I pulled across gradually the hawsers would slide over the top of the buoy, but the hawser caught the buoy and I tried to pull it clear and the cable broke."

Captain Sullivan testified that the port hawser parted at the time when they were trying to get clear of the stakeboats.

Captain Bill negligently took the chance and risk that his hawser would clear the buoy. It did not. The damage resulted solely by reason of the negligent and careless act of Captain Bill. His tug was the leading one. The libelant should have a decree in its favor with respect to the damages to the barge Green Island.

Settle decree on two days' notice.